## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brea McCarty, | Court File No.: 12-cv-2512 (TNL) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION & ORDER** |
| The City of Eagan, | |
| Defendant. | |

Lisa McLoed Lofquist, **Villaume & Schiek, P.A.**, 2051 Killebrew Dr., Suite 611, Bloomington, MN 55425, for Plaintiff; and

Jana O'Leary Sullivan, **League of Minnesota Cities**, 145 University Ave. West, St. Paul, MN 55103, for Defendant.

This matter is before the Court, Magistrate Judge Tony N. Leung, on Defendant City of Eagan's ("the City") Motion for Summary Judgment (ECF No. 12). The Court heard oral argument on the motion. (*See* ECF No. 20.) Plaintiff Brea McCarty asserts claims against the City for violations of Title VII and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.* Based on the arguments of counsel, and all the files, records and proceedings herein, the Court will **GRANT** the motion.

1

I.  **BACKGROUND**[1]

   A.  **The City's Employment Structure**

The City is divided into several departments, including administration, building inspections, communications, community development, finance, fire, parks and recreation, planning and zoning, police, and public works. (Sullivan Aff. (ECF No. 15) Ex. 16.) The police department comprises 85 employees, including 70 sworn officers and 15 support staff. (*Id.* Ex. 13; *id.* Ex. 3 at 11.) Lynn Vasquez manages the department's records unit, which at all relevant times employed four full-time level IV clerical technicians (McCarty, Margaret Knoll, Cindy Scipioni, and Susan Smart), two part-time level IV clerical technicians (Susan Kroeger and Susan Peterson), and one full-time receptionist (JoAnne O'Keefe). (*Id.* Ex. 13.) Records employees are members of the Minnesota Teamsters Public and Law Enforcement Employees' Union, Local No. 320. (*Id.* Ex. 12.)

A labor agreement ("CBA") between the City and Minnesota Teamsters Public and Law Enforcement Employees' Union, Local No. 320, provides that seniority is the determining criterion for shift schedules. (*Id.* Ex. 12 at 15.) Records employees would bid for shifts according to seniority; the most senior would select first, then the second-most senior, and so forth until all the shifts were filled. (*Id.*) When the CBA was renegotiated,[2] the City adopted a stricter policy that allows shift changes in two circumstances: (1) to fill a vacancy; or (2) where an unforeseen event occurs in the police department that requires the schedule be adjusted and the change benefits the police department. (*Id.* Ex. 5 at 17-22.)

---

[1] Because this action is before the Court on the City's motion for summary judgment, the Court views any disputed facts in a light most favorable to McCarty, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] The record is unclear exactly when the CBA was renegotiated. It is undisputed, however, that McCarty's first shift-change request occurred before the new CBA was executed, and the shift-change request at issue in this case occurred after the change.

2

### B. McCarty's Employment

McCarty began working for the City as a part-time receptionist for the records unit on June 25, 2006. (*Id.* Ex. 54, Ex. 1 at 30-31.) Over the course of her employment, she consistently received very positive performance evaluations. (*Id.* Ex. 6 at 12, 14, 19, 20.) In April 2007, McCarty traded positions with a full-time employee who wanted to work part-time. (*Id.* Ex. 6. at 10.) She received a promotion from Clerical Technician III to Clerical Technician IV and a corresponding pay raise in July 2007. (*Id.* Ex. 50.)

McCarty requested and was granted FMLA leave from mid-November 2007 to mid-February 2008 to have a child. (*Id.* Ex. 49.) Before her scheduled return on February 19, 2008, McCarty contacted Vasquez requesting a temporarily modified work schedule. (*Id.* Ex. 41.) Specifically, she requested that she be reduced to 30-hour weeks from 40-hour weeks. (*Id.*) On January 31, 2008, the City approved McCarty's request as "an *intermittent* Child Care Leave under City Policy." (*Id.* Ex. 42 (emphasis in original).) The City emphasized that it considered this a "one time occurrence," emphasized that it would "in no way set a precedent," and provided that "[a]t the end of three months [McCarty's] request *may be* reevaluated at [her] request, with no promises or obligations for the City [ ] to extend it." (*Id.*)

In September 2008, McCarty formally requested that her shift be adjusted from 0800-1630 to 0730-1600. (*Id.* Ex. 43.) On September 25, 2008, the City approved this shift adjustment for a six-month period. (*Id.*) In the memorandum granting the request, Vasquez stated she was approving the request "because it [did] not impose on the daily operations of the police department or the clerical unit, nor [did] it affect [McCarty's] current status as a full-time employee." (*Id.*) Vazquez also reminded McCarty that "the department still ha[d] a right to rescind this agreement during the next six months due to unforeseen circumstances." (*Id.*)

3

On October 22, 2009, a new shift bid occurred. (*Id.* Ex. 33.) A few weeks after the newly-bid schedule went into effect, Susan Smart was unhappy and wanted to change shifts. (*Id.* Ex. 1, at 83-85.) Smart and McCarty approached the City, and the City agreed that they could switch shifts because both employees wanted the change and no one else was interested in the two shifts at issue. (*Id.*)

In January 2010, McCarty again requested and was granted FMLA leave—this time from March 30, 2010 to June 29, 2010—to have a second child. (*Id.* Ex. 48.) On June 8, 2010, a new shift bidding occurred after a clerical employee left her position with the City. (*Id.* Ex. 34.) McCarty was third-most senior at this time, and she bid for and received the C shift – 0800 to 1630 Monday through Friday. (*Id.*) In accordance with department policy, this shift bidding sheet provided, "This bid will remain in effect until a vacancy or other unforeseen event occurs in the police department which requires adjustment(s)." (*Id.*) On October 8, 2010, McCarty requested another shift adjustment, seeking to move from full-time to part-time. (*Id.* Ex. 47.) Before the City decided whether to grant or deny her request, McCarty withdrew it. (*Id.*; *id.* Ex. 4 at 16-18; *id.* Ex. 6 at 31-32.)

### C.  Events Giving Rise to the Instant Claims

On December 15, 2011, McCarty went into Vasquez's office, shut the door, and said that she wanted to talk. (*Id.* Ex. 1 at 67-68; *id.* Ex. 37.) McCarty told Vasquez that she was pregnant. (*Id.* Ex. 1 at 68.) Vasquez asked if the pregnancy was planned, and McCarty said that it was not. (*Id.*) McCarty said that this could not be happening at a worse time for financial reasons. (*Id.* at 68-69.) Vasquez tried to comfort McCarty throughout the conversation. (*Id.*) McCarty also informed Vasquez that she would take 12 weeks of FMLA leave after the birth, just as she had with her first two children, which would begin near the end of June or the beginning of July. (*Id.* at 70; *id.* Ex. 37.)

4

At this meeting, McCarty and Vasquez did not discuss any potential scheduling changes, and McCarty did not raise any pregnancy-related medical conditions from which she suffered or accommodations that she required. (*Id.* Ex. 1 at 66-72.)

On January 5, 2012, McCarty approached Vasquez and proposed changing her schedule. (*Id.* at 77.) McCarty went into Vasquez's office, shut the door, and raised the idea of changing to part-time and Susan Kroeger, another clerical employee, going to full-time. (*Id.* at 77-78.) McCarty proposed the shift change to accommodate the eventual increase in daycare costs. (*Id.* at 78-79.) Vasquez was unable to reach Kroeger, and she told McCarty that she would take it to the command staff to see what they thought of the idea. (*Id.* at 78.) Vasquez told McCarty that they should wait to raise the subject with Kroeger until she heard from her supervisors. (*Id.* at 82-83; *id.* Ex. 6 at 40-41, 68-69.)

Vasquez raised McCarty's proposed shift change to her supervisor Lt. Roger New on January 5 or 6. (*Id.* Ex. 6 at 41.) Lt. New said he would take McCarty's proposal to the command staff. (*Id.*) Vasquez relayed this information to McCarty on January 6, which was a Friday. (*Id.* Ex. 36.) The following Monday, January 9, McCarty asked Vasquez via email if she'd heard anything from command, and Vasquez responded that she had not. (*Id.* Ex. 1 at 88; *id.* Ex. 36.) That same day, McCarty approached Kroeger in the hall closet and asked if she would be willing to switch shifts. (*Id.* Ex. 1 at 88-89.) Kroeger told McCarty that she would have to discuss it with her husband. (*Id.*)

Sometime between January 5 and January 10, Lt. New met with the command staff and brought McCarty's shift-change request to their attention. (*Id.* Ex. 3 at 14-19.) Command staff agreed that granting the request was not required under the City's policy. (*Id.*) It was understood that the purpose of McCarty's request was to save money on daycare expenses. (*Id.*; *id.* Ex. 4 at 13-14.)

5

On January 10, Vasquez emailed McCarty and told her that command had reached a decision regarding her shift-change request. (*Id.* Ex. 1 at 91.) At about 2:30 p.m., McCarty went to Vasquez's office and Vasquez told her that she did not have good news. (*Id.*) Vasquez said that command denied her shift-change request because it did not address either a vacancy or an unforeseen event in the police department. (*Id.*; *id.* Ex. 36.)

McCarty became upset and said that she might have to quit. (*Id.* Ex. 1 at 93; *id.* Ex. 36.) She then stood up and said that she had to leave. (*Id.* Ex. 1 at 96-97; *id.* Ex. 36.) Vasquez said, "Ok." (*Id.* Ex. 6 at 49.) On her way out of Vasquez's office, McCarty said, "I've put so much time and effort into you guys and you are fucking me over." (*Id.*; *id.* Ex. 36; *see also id.* Ex. 1 at 93.) McCarty walked to her desk, got her coat, and left the building. (*Id.* Ex. 6 at 50-51; *id.* Ex. 36.) McCarty did not return to work that afternoon. After she walked out of the building, she spoke with Officer Karin Pederson for about 45 minutes. (*Id.* Ex. 1 at 97-98.) When she was done speaking with Officer Pederson, McCarty got in her car and went home. (*Id.* at 99-100.)

Vasquez memorialized her conversation and McCarty's reaction to the denial of her shift-change request in a memorandum to Lt. New that afternoon. (*Id.* Ex. 36.) Lt. New called McCarty at home and left a message at 3:37 p.m. (*Id.* Ex. 1 at 101; *id.* Ex. 26 at 2.) McCarty returned his call at 4:10 p.m., and Lt. New informed her that she was being placed on administrative leave. (*Id.* Ex. 1 at 101-02; *id.* Ex. 26 at 2.) When McCarty asked for an explanation, Lt. New said that he was not able to give her one until they met. (*Id.* Ex. 1 at 101-02.) McCarty hung up and called Vasquez. (*Id.* at 103-04.) Vasquez stated that she did not know what was going on but she would try to find out and let McCarty know. (*Id.*)

On January 11, McCarty received written notice that the City was placing her on paid administrative leave and investigating a complaint made regarding her conduct. (*Id.* Ex. 25.)

6

Specifically, the notice informed McCarty that Lt. New was investigating whether she violated police department rules of conduct and the City's respectful workplace policy by (1) engaging in insubordination; (2) being absent from duty without permission; and (3) engaging in offensive behavior. (*Id.*)

Lt. New interviewed McCarty on January 13. (*Id.* Ex. 15.) In the interview, McCarty informed Lt. New that she had spoken to Kroeger in the hall closet on January 9 about her shift-change request. (*Id.* at 3-4.) Lt. New asked if McCarty had called or emailed any other City employees since receiving the notice that she was under investigation. (*Id.* at 8.) McCarty responded that she had contacted her union representative Sami Gabriel, called Susan Peterson, and tried unsuccessfully to reach Kroeger. (*Id.* at 9-10.) She stated that she did not remember contacting any other City employees after receiving the written notice. (*Id.* at 9.) McCarty also gave Lt. New a typed summary of events stating that she had also contacted Cindy Scipioni on January 12 and Margaret Knoll. (*See id.* Ex. 28 at 4.)

Lt. New prepared his investigation summary and presented it to Deputy Chief Jeff Johnson on January 16. (*Id.* Ex. 26.) On January 18, McCarty contacted Gabriel to "clarify that [she] misunderstood [Lt. New's] question about communication via email and phone after [McCarty] received the memo" on January 11. (*Id.* Ex. 27.) Her letter stated that during the interview, she understood Lt. New's question only to refer to any communications she might have made on Wednesday, January 11. (*Id.*) McCarty then stated that after Wednesday, she had called Margaret Knoll and asked her to prepare a document stating whether McCarty was disruptive when she left the office on January 10. (*Id.*)

Chief of Police James McDonald sent McCarty a notice of a *Loudermill* hearing on January 19. (*Id.* Ex. 28.) This notice detailed allegations of insubordination, criticism of orders or

7

instructions, absence from duty, lack of truthfulness, and offensive behavior, all in violation of City and police department policies. (*Id.* at 2.)

The City held McCarty's *Loudermill* hearing on January 20, 2014. (*Id.* Ex. 29.) Chief McDonald, McCarty, Gabriel, and HR Manager Lori Peterson were present. (*Id.*) McCarty presented the City with a written response to the facts contained in the *Loudermill* notice. (*Id.* Ex. 38.) At the end of the hearing, Peterson and Chief McDonald informed McCarty that they would be recommending the City terminate her employment. (*Id.* Ex. 29 at 13.) They also gave McCarty the option to resign in lieu of termination because being terminated would "make[] it difficult for future employment . . . ." (*Id.*) By letter dated January 23, 2012, McCarty resigned effective February 7, 2012. (*Id.* Ex. 30.)

After McCarty resigned in lieu of termination, the City conducted a bid request to fill her former position. (*Id.* Ex. 35.) Kroeger bid for and was granted McCarty's former full-time shift. (*Id.*) The City then hired Saundra Buenning to fill the part-time position Kroeger was vacating. (*See id.* Ex. 13.)

On September 19, 2012, McCarty commenced this action, asserting that the City engaged in pregnancy discrimination in violation of Title VII and the MHRA by (1) failing to accommodate her by denying her shift-change request, and (2) terminating her employment. After discovery was completed, the City moved for summary judgment on all claims. (ECF No. 12.) The matter has been fully briefed, the Court heard oral argument on the motion, and the issues are now ripe for disposition.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Henerey v. City of St. Charles*, 200 F.3d 1128, 1131 (8th Cir. 1999); Fed. R. Civ. P. 56(c). The movant has the burden of demonstrating that no genuine issue of material fact remains to be decided. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a motion for summary judgment has been made and supported by the pleadings and affidavits, the burden shifts to the party opposing the motion to demonstrate with "specific facts" that a disputed issue of material fact remains. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts must make all inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. A disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, and an issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* at 248; *Planned Parenthood of Minnesota/South Dakota v. Rounds*, 372 F.3d 969, 972 (8th Cir. 2004).

"Because [employment] discrimination cases often turn on inferences rather than on direct evidence, [courts] are particularly deferential to the non-moving party." *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 486 (8th Cir. 1996). Nevertheless, although "summary judgment should seldom be granted in employment discrimination cases, if [the Plaintiff] fails to establish a factual dispute on each element of the prima facie case, summary judgment is appropriate." *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 762 (8th Cir. 1995) (quotation omitted).

### B. McCarty's Accommodation Claim Fails as a Matter of Law

In her complaint, McCarty asserts a failure-to-accommodate claim under Title VII and the MHRA. (*See* Compl.) At oral argument and in their written submissions, however, both parties

agreed that the Court should apply the factors from *Fenney v. Dakota, Minnesota & Eastern Railroad Co.*, 327 F.3d 707 (8th Cir. 2003) —an ADA case—to determine whether a genuine dispute of material fact exists with respect to McCarty's failure-to-accommodate claim. Accordingly, the Court will refer to the ADA when analyzing McCarty's failure-to-accommodate claim. *See Kobus v. College of St. Scholastica, Inc.*, 608 F.3d 1034, 1038 (8th Cir. 2010) (claims arising under the ADA and MHRA are analyzed under the same standard).

McCarty bases her failure-to-accommodate claim on the City's denial of her shift-change request on January 10, 2012. The ADA and MHRA require employers to provide reasonable accommodations to disabled employees. 42 U.S.C. § 12112(b)(5)(A); Minn. Stat. § 363A.08, subd. 6. To establish a prima facie case of discrimination under the ADA, McCarty must show: (1) she has a disability within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 (8th Cir. 2003) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (*en banc*)); *Fenney*, 327 F.3d at 712.

As a threshold matter, McCarty must produce sufficient evidence to demonstrate that she has a disability. *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 547 (Minn. 2001). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual." 42 U.S.C. § 12102(2)(A). The MHRA defines a person as "disabled" if she "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363A.03, subd. 12. The relevant ADA regulations aid courts in determining whether an impairment materially limits a major life activity under the MHRA. *Mallon*

10

*v. U.S. Physical Therapy, Ltd.*, 395 F. Supp. 2d 810, 817 n.1 (D. Minn. 2009). Major life activities are those activities that are "of central importance to most people's lives," *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002), such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, thinking and concentrating." *Stusse v. Von Maur, Inc.*, Civ. No. 08-1088 (DSD/SRN), 2009 WL 1789379, at *3 (D. Minn. June 23, 2009) (citations omitted).

"[N]o court currently maintains that pregnancy *per se* is a disability under the ADA." *Gorman v. Wells Mfg. Corp.*, 209 F. Supp. 2d 970, 975 (S.D. Iowa 2002). There is support for the position that "pregnancy-related *complications* can constitute a disability under the ADA." *Id.* at 975-76 (collecting cases) (emphasis added). The record before the Court, however, makes clear that McCarty's reason for requesting a shift change was her pregnancy-related *financial* concerns—not medical complications relating to her pregnancy.[3]

After reviewing case law in this and other circuits, the Court determines that neither the fact of pregnancy itself nor the impending increase in day-care costs constitutes a pregnancy-related condition within the meaning of the ADA. Indeed, pregnancy-related conditions that require employers to make accommodations for employees tend towards the medical rather than the financial. *See, e.g.*, *LaCoparra v. Pergament Home Centers, Inc.*, 982 F. Supp. 213, 228 (S.D.N.Y. 1997) ("The record supports [the plaintiff's] claim that she suffered from a history of infertility, a prior miscarriage, and spotting and cramping during [her] 1994 pregnancy," but "[t]here is no evidence . . . that any of these conditions were chronic or resulted in long-term or permanent impact."), *overruled on other grounds*, *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d

---

[3] *See* McCarty Dep. at 78 (Q: Okay. And what was your reason for requesting that scheduling change? A: Daycare costs.); 135 (Q: And was it you – has it been your testimony that that accommodation would have been for your daycare obligations? A: Correct. Q: And that was not an accommodation you needed for your pregnancy

11

706 (2d Cir. 2001); *Cerrato v. Durham*, 941 F. Supp. 388, 393 (S.D.N.Y. 1996) (determining that allegations of pregnancy-related spotting, leaking, cramping, dizziness, and nausea, and accompanying allegations that such conditions substantially limited her ability to work, were sufficient to state a claim); *Patterson v. Xerox Corp.*, 901 F. Supp. 274, 278 (N.D. Ill. 1995) (allegations of severe back pain that substantially limited plaintiff's ability to work were sufficient to state a claim); *Garrett v. Chicago Sch. Reform Bd. of Trs.*, 1996 WL 411319 at *3 (N.D. Ill. July 19, 1996) (determining that allegations of severe morning sickness that substantially limited her ability to attend school were sufficient to state a claim).

Viewing the evidence in a light most favorable to McCarty, the Court concludes that no genuine issue of material fact exists with respect to her failure-to-accommodate claim. By all accounts—and importantly, by McCarty's own testimony—her pregnancy had no medical complications that required accommodation from the City, and her requested accommodation was to help relieve the financial stress associated with a new child. Although the increased financial costs of an additional child are substantial and undeniable, McCarty's additional financial hardships do not require accommodation under the ADA. Accordingly, the City's motion for summary judgment will be granted with respect to this claim.

### C. Pregnancy-Discrimination Claim

Turning to her pregnancy-discrimination claim, McCarty asserts that the City violated Title VII by denying her shift-change request and subsequently terminating her employment. Title VII and the MHRA[4] prohibit discrimination on the basis of pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e(k); Minn. Stat. §§ 363A.03, subd. 42, 363A.08, subd. 2. The MHRA

---

[footnote continued from previous page] itself? A: No, not the pregnancy.).
[4] "[S]ex discrimination claims under Title VII and the MHRA may be analyzed simultaneously." *Roberts v. Park Nicollet Health Services*, 528 F.3d 1123, 1127 (8th Cir. 2008) (citing *Bergstron-Ek v. Best Oil Co.*, 153 F.3d 851,

imposes liability on an employer where pregnancy was the motivating factor in an employment decision. *See Anderson v. Hunter, Keith, Marshall & Co., Inc.*, 417 N.W.2d 619, 626-27 (Minn. 1988). Because McCarty relies on circumstantial evidence to prove her Title VII claim, the Court must analyze her claim under the burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-04 (1973). *See also Colenburg v. Starcon Int'l, Inc.*, 619 F.3d 986, 991-94 (8th Cir. 2010). Under this framework, McCarty must first establish a prima facie case of discrimination by showing: (1) she is a member of a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) she was discharged under circumstances giving rise to an inference of discrimination. *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011).

If McCarty establishes a prima facie case, the burden of production shifts to the City to articulate "a non-discriminatory, legitimate justification for its conduct which rebuts the employee's case." *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 879 (8th Cir. 2010). If the City meets this burden, McCarty must then produce evidence sufficient to create a genuine issue of material fact that the City's proffered explanation is merely a pretext for discrimination. *Id.* "[T]he issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir. 2008) (emphasis in original) (internal quotation marks omitted).

### 1. Shift-Change Request

To the extent that McCarty seeks to assert a Title VII claim for the City's denial of her shift-change request, the Court determines that she has not established a prima facie case of pregnancy discrimination. "An adverse employment action is a tangible change in working conditions that

---

857 (8th Cir. 1998)).

produces a material employment disadvantage," *Spears v. Mo. Dep't of Corr. & Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000), and McCarty has pointed to no evidence that being denied her shift-change request constitutes an adverse employment action under Title VII. This Court has stated before that "not being able to switch shifts on one occasion" does not constitute an adverse employment action. *Moss v. Advance Circuits, Inc.*, 981 F. Supp. 1239, 1246-47 (D. Minn. 1997). *See also Holmes v. Archer Daniels Midland Co.*, 724 F. Supp. 2d 1050, 1063 (D. Neb. 2010) ("Because there is no evidence to show that [the plaintiff] had any right to change shifts, the denial of such a request could not be an adverse employment action.")

Even assuming that denying McCarty's requested shift change constituted an adverse employment action sufficient to give rise to a Title VII claim, her claim would still fail. The City has asserted the terms of the CBA as a legitimate nondiscriminatory reason for its action. Viewing the evidence in a light most favorable to McCarty, she has failed to put forth any evidence that this reason is mere pretext for discrimination. McCarty argues that in 2009, she and another City employee switched shifts "because both employees wanted the shift change and no one else was interested in these shifts." (Def. Mem. at 3 n.1.) The CBA governing the procedures for changing shifts among clerical staff, however, changed before McCarty requested the shift change at issue in this case. (*See* Sullivan Aff., Ex. 4, at 31-32; *id.*, Ex. 6, at 55-59; *id.*, Ex. 12 (effective Jan. 1, 2011 through Dec. 31, 2012).) McCarty has put forth no evidence that the CBA requirements in place were substantially similar to those put in place by the 2011-12 CBA,[5] and therefore, the earlier shift change is not evidence of the City's alleged inconsistency in applying the shift-change requirements in place under the CBA. *See Harris v. Emergency Providers, Inc.*, 51 Fed. App'x 600, 601 (8th Cir.

---

[5] Moreover, McCarty has not disputed the City's characterization that, with respect to when the City would approve shift-change requests, the terms of the 2011-12 CBA were stricter than those in the earlier CBA. (*See* Ex. 3 at 20-21; Ex. 5 at 17-22, 33-35; Ex. 6 at 73-74.)

2002) (determining that the defendant company's demand for employee to undergo a fitness-for-duty examination did not violate the FMLA "as it was consistent with the [CBA] provisions before the District Court, and [the employee] failed to provide evidence that [the defendant company] inconsistently applied the fitness-for-duty requirements") (citation omitted). Accordingly, to the extent McCarty bases her Title VII claim on the City's denial of her shift-change request, the Court determines that she has failed to establish a prima facie case.

### 2. Termination

#### a. Prima Facie Case

With respect to her termination claim, however, the Court determines that McCarty has met her burden to establish a prima facie case. The parties agree that McCarty is a member of a protected group; she was qualified for her position; and her termination constitutes an adverse employment action. (*See* Def.'s Mem. at 20.) The City argues that McCarty fails to state a prime facie case because she has not provided any evidence of similarly situated employees being treated differently. Comparison to similarly-situated employees who were not in her protected class, however, is merely "[o]ne way a plaintiff can establish an inference of discrimination." *Wierman*, 638 F.3d at 993-94; *see also Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 687 (8th Cir. 1998) ("One common way to raise an inference is to prove disparate treatment 'by showing that [plaintiff] was treated less favorably than similarly situated employees who are not in plaintiff's protected class.' *Johnson v. Legal Servs. of Ark., Inc.*, 813 F.2d 893, 896 (8th Cir. 1987) (racial and disability discrimination)." (alteration in original)).

Here, despite the lack of comparators, other circumstances support a prima facie inference of discrimination. The City placed McCarty on administrative leave just three weeks —and terminated her employment barely more than a month— after learning she was pregnant and would be taking 12

weeks of FMLA leave. It is true that courts are generally "'hesitant to find pretext or discrimination on temporal proximity alone.'" *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 610 (8th Cir. 2006) (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001)). Temporal proximity, however, is not the only circumstance that gives rise to an inference of discrimination in this case. It is undisputed that McCarty's replacement was not pregnant. Moreover, Kroeger, the woman who eventually took McCarty's shift after her employment was terminated, was the very person McCarty suggested they approach to switch shifts. Viewing the facts in a light most favorable to McCarty, the Court determines that McCarty has made out a prima facie case based on the City's termination of her employment.

### b.  Legitimate, Non-discriminatory Reason

The burden now shifts to the City to articulate "a non-discriminatory, legitimate justification for its conduct which rebuts the employee's case." *Elam*, 601 F.3d at 879. This burden "is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999). Moreover, district courts are "not supposed to evaluate the veracity of [an employer's] offered reasons." *Groves v. Cost Planning & Mgmt. Intern., Inc.*, 372 F.3d 1008, 1009 (8th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The City puts forth the following as legitimate, non-discriminatory justifications for terminating McCarty's employment: "(1) engaging in insubordination; (2) criticizing lawful orders/instructions; (3) being absent from duty; (4) being untruthful; and (5) engaging in offensive/disrespectful behavior." (Def. Mem. at 21 (citing Ex. 28).)

Having reviewed the record, the Court determines that the City has satisfied its burden of production. Even viewing it in the light most favorable to McCarty, she does not deny swearing at

Vasquez as she was leaving her office on January 10 or speaking to Kroeger about the shift change despite Vasquez telling her not to. The record also shows discrepancies between what McCarty told her superiors in the January 13 interview and what she told them in the letter she provided before her *Loudermill* hearing. The City conducted an investigation into McCarty's conduct and determined that she had engaged in misconduct under the City's policies, and absent a showing of bad faith, the City's determination is "entitled to latitude." *Alvarez v. Des Moines Bolt Supply, Inc.*, 636 F.3d 410, 417 (8th Cir. 2010). The Eighth Circuit has "'repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.'" *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) (quoting *Kiel*, 169 F.3d at 1134). Accordingly, the Court determines that the City has satisfied its burden of showing legitimate, non-discriminatory reasons for terminating McCarty's employment.

### c. Pretext

Because the City has articulated a legitimate, non-discriminatory reason for its decision to terminate McCarty, the burden shifts back to McCarty "to produce evidence sufficient to create a genuine issue of material fact regarding whether [the City's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (quoting *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005)) (alteration in original). A plaintiff may meet this burden by showing that the employer's explanation is "unworthy of credence because it has no basis in fact," or "by persuading the court that a [prohibited] reason more likely motivated the employer." *Torgerson*, 643 F.3d at 1047 (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)); *see also Sprenger*, 253 F.3d at 1114. McCarty argues that both the temporal proximity of the City's decision to terminate her employment and the parties' disagreement over the events of January 10, 2012, that led

directly to her forced administrative leave and eventual termination generate genuine issues of material fact for trial. (Pl.'s Mem. at 27-30.)

The Court disagrees. As to McCarty's temporal-proximity argument, it is undisputed that McCarty was placed on administrative leave less than a month after the City learned of her pregnancy. McCarty informed the City that she was pregnant on December 15, and she was placed on administrative leave on January 10. Temporal proximity, however, is generally insufficient on its own to show pretext. *Sprenger*, 253 F.3d 1106, 1113-14 (8th Cir. 2001) ("[W]e have been hesitant to find pretext or discrimination on temporal proximity alone."). The events of January 10 give an explanation for the timing of McCarty's termination other than any discriminatory motive on the City's part. *See id.* ("An employee's attempt to prove pretext or actual discrimination requires more substantial evidence [than is required to make a prima facie case], however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification."). Although the sanction the City imposed was arguably harsh, McCarty has not argued that the City's investigation into her conduct on January 10 was selective enforcement of its policies, and even if she had, she has not provided evidence of other employees who engaged in similar conduct that were not subject to the same level of punishment. *See Wierman*, 638 F.3d 997-98; *Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 724 (8th Cir. 1985).

McCarty's argument that her disagreement with the results of the City's investigation creates genuine fact issues for trial is similarly unavailing. "[S]hortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 863 (8th Cir. 2009). McCarty must provide some evidence that the City's findings were motivated by unlawful discrimination rather than a good-faith belief that she had violated the City's policies. *Wierman*, 638 F.3d at 998; *see also McCullough*, 559 F.3d at 862 ("The critical

inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge."). Thus, whether the City's ultimate determination was correct is not a genuine fact issue for trial. *Eurle-Wehle v. United Parcel Serv., Inc.*, 181 F.3d 898, 900 (8th Cir. 1999).

The undisputed facts before the Court show that the City conducted a thorough investigation into McCarty's conduct on January 10, 2012, at the end of which it determined that she had violated City policy. This determination came only after the City heard McCarty's testimony, obtained the statements of several other city employees, and made credibility determinations based on that information. The evidence "was not so lopsided as to support a reasonable conclusion" that the City was acting in bad faith when it determined that McCarty committed misconduct. *Alvarez*, 626 F.3d at 417. Moreover, McCarty has put forth no evidence that the City's reasons for terminating her were false or that the City conducted the investigation in bad faith, and accordingly, the City's credibility determinations are "entitled to latitude." *Id.*

Viewed either individually or cumulatively, McCarty's evidence is insufficient either to undermine the City's legitimate, non-discriminatory rationale for terminating her employment or to support a reasonable inference that the decision was motivated by pregnancy discrimination. As such, there is no basis from which a jury could find that the City's decision to terminate McCarty's employment was pretextual, i.e., motivated by discrimination based on her pregnancy. Accordingly, the Court must grant the City's motion for summary judgment.

### III.     CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant City of Egan's Motion for Summary Judgment be **GRANTED** and this case be **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:   April 28, 2014                                           s/ Tony N. Leung
                                                                 Tony N. Leung
                                                                 United States Magistrate Judge
                                                                 District of Minnesota

                                                                 *McCarty v. City of Egan*
                                                                 File No. 12-cv-2512 (TNL)